UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
BRIAN THOMAS,                                        :

                  Plaintiff,        :        04 Civ. 10248 (JSR) (GWG)

    -v.-                                         :        REPORT AND
                                 RECOMMENDATION
S.E.A.L. SECURITY, INC., et al.,

                       :

               Defendants.
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Brain Thomas, proceeding pro se, brings this action pursuant to Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000(e)-17, 42 U.S.C. § 1981, the

New York State Human Rights Law, N.Y. Exec. Law § 296, the New York City Human Rights

Law, New York City Administrative Code § 8-101, and the Fair Labor Standards Act alleging

that his employer S.E.A.L. Security, Inc. discriminated against him on the basis of his race and

national origin and retaliated against him for engaging in protected activities.  Defendants have

moved for summary judgment.  For the following reasons, the motion should be granted.

I.  BACKGROUND

      Except as otherwise noted, the following facts reflect Thomas's version of the events

relevant to his termination.

    A.  Facts

      Thomas worked for S.E.A.L. Security from July 2000 to August 2001.  See Affidavit

Apposition [sic] to Motion Granting Defendants Summary Judgment, dated Jan. 26, 2007

(Docket #29) ("Thomas Aff."), at 2.  Thomas was hired to work as a security guard at 499 Park

Avenue.  See Deposition of Brian Thomas, dated Mar. 20, 2006 (transcript reproduced as Ex. A

to Affidavit of Alan Serrins in Support of Summary Judgment, dated Dec. 26, 2006 (attached to

Notice of Motion for Summary Judgment, filed Dec. 26, 2006 (Docket #27) ("Not. of Mot."))),

at 36-37.  Although he was hired to replace someone who worked the console – "the security

room where all the monitors and cameras are" located – in fact, he initially was assigned to work

in the basement.  Id.; see also id. at 48-51.  "Eventually," however, he "was rotated from [the

basement] to other posts throughout the [building.]"  Id. at 41-42.

Thomas "always" arrived to work "half an hour before the start of [his] shift," id. at 60,

in order to "get briefed on post assignment."  Id. at 75.  Typically, however, "as soon as [he]

walk[ed] in the door, [he] would be sent to relieve people in different parts of the building . . .

[s]ometimes . . . [without] even . . . a chance to put [his] bag down."  Id. at 60-61.  "[F]or

example, [if he was] supposed to start at 11:00, [he] was starting [at] 10:35, 10:15 . . . ."  Id. at

61.

On Tuesday, August 7, 2001, see id. at 214 (citing Official Reprimand, dated Aug. 8,

2001 (reproduced as Ex. B-1 of Serrins Aff.)), Thomas arrived to work at 10:35 p.m., see id. at

215, in preparation for his 11 p.m.-7 a.m. shift.  See id. at 169; Thomas Aff. at 9.  "When

[Thomas] went up to the office to get briefed for [his] duties for the evening, [his supervisor] Mr.

Cordero asked [him] to go immediately to the third floor and relieve Remy Deiter."  Thomas

Dep. at 216.  In response, Thomas "asked [Cordero] if [he] was going to be paid over time for

relieving Mr. Deiter early."  Id.  Apparently, Mr. Cordero explained that such a decision was

beyond his control and that "the office" authorized the payment of overtime, not him.  Id.  At

that point, Thomas replied: "well, if you're sending me to relieve the person, shouldn't you put

in for overtime."  Id.  Cordero stated that Thomas should speak to Mr. Cacciatore, id., the Site

Security Director.  See Affidavit of Robert Tighe in Support of Summary Judgment, dated Dec. 26, 2006 ("Tighe Aff.") (attached to Not. of Mot.), ¶ 4.  Then, Thomas "took the radio and relieved Mr. Deiter on the third floor 15 minutes prior to the start of [his] shift."  Thomas Dep. at 216.  According to Thomas, "Mr. Cordero never mentioned anything to [Thomas] about being disrespectful or discourteous or anything of the sort.  We never had any dialogue about any disciplinary action."  Id.; see also id. at 259.

The next day, however, the building Administrator David Eisenhauer, see Affidavit of Robert Cacciatore, dated Dec. 28, 2006 ("Cacciatore Aff.") (attached to Not. of Mot.), ¶ 6, gave Thomas an "Official Reprimand," see Thomas Dep. at 216, 220, which stated that on August 7, Thomas "became agitated and combative and stated that he was not relieving anyone at the very beginning of his shift."  See Off. Rep.  Eisenhauer indicated that Cacciatore had left the reprimand for Thomas to sign.  See Thomas Dep. at 220.  Thomas read the document, but refused to sign it because, as he explained to Eisenhauer, he did not agree with the substance of the reprimand.  Id. at 215, 220.  Eisenhauer then explained that, "if [Thomas] d[id]n't sign it, [he was] to be suspended for two days."  Id. at 220.  Thomas did not sign it and consequently, was "escorted out of the building."  Id.  Thomas was suspended for August 9 and August 12.  Id. at 222, 258; see also Cacciatore Aff. ¶ 4.

On August 13, 2001 at around 7:00 p.m., Thomas states that, in compliance with S.E.A.L. policy, he "called and told [S.E.A.L.] that [he] would not be in because [he] had some problems, some stuff to take care of at home . . . ."  Thomas Dep. at 222-25.  Thomas stated that he spoke to Cordero, who told him "okay."  Id. at 224.  Shortly thereafter, Thomas's wife took "a call from Rene Cordero at [approximately] eight something in the night . . . to tell [Thomas] that

if [he did not] come into work [he] would be suspended and that it would be marked down as post abandonment." Id. at 224.  When Thomas received the message, he "called him right back and asked [Cordero] why he was calling [his] house and harassing [his] family."  Id.  By harassment, Thomas meant that such a call was inappropriate since he had complied with company policy regarding absences.  Id. at 224-25.  During that call, Thomas recalled Cordero and another employee "laughing on the phone . . . making a joke out of it."  Id. at 225.  Thomas "asked him why he was calling my house" and Cordero repeated his earlier instructions that Thomas would be marked as an unauthorized absence if he did not report to work.  Id. at 230. Thomas said that he had "already called and complied with company policy for call outs," and repeated, "why are you calling my house[?]"  Id.  Thomas "hung up the phone" when he perceived that the conversation had ended.  Id. at 230-31.  He did not report to work on August 13 because "he did not have to."  Id. at 231.  He did not report to work on August 14, 2001 either.

Sometime after August 13, Thomas received a document from S.E.A.L. in the mail which stated that he had been suspended a second time, effective immediately, for being absent without authorization.  Id. at 232-34.  See also Letter from David Eisenhauer to Brian Thomas, dated Aug. 14, 2001 (reproduced as Ex. B-4 to Serrins Aff.).  At some point during his suspension, Thomas made two efforts to discuss the situation.  During his first suspension, Thomas wrote a letter to William Kenney, Thomas Dep. at 140-41, 235-38, who Thomas knew to be "the admin person . . ., the person who looks after payroll and . . . the person who hired [him]."  Id. at 41; see also Defendants' Memorandum of Law In Support of Summary Judgment, dated Dec. 28. 2006 (attached to Not. of Mot.) ("Def. Mem."), at 4 (identifying Kenney as the "Director of

Operations").  The letter stated, inter alia, that it would "serve as both a complaint and request

for overtime due me for work performed at the above mentioned location."  Thomas Dep. at 237.

In the letter, Thomas also referred to "equal pay provisions [which were] not being enforced," id.

at 260, "a hostile work environment," and "discrimination in job assignments," id. at 259; he

also stated that he had been subjected to "[b]ias-related harassment based on retaliation," id. at

252, and his "basic First Amendment rights [were] being violated."  Id. at 258.  Additionally,

Thomas "called and . . . reported [the situation] to [Human Resources Director] Robert Tighe,

who [he had been] told to contact in reference to any one of these complaints."  Id. at 235.  Tighe

informed Thomas that the suspension stood and he should report to a meeting on August 22,

2001.  Id.

        Eisenhauer and Tighe, as well as two additional employees, Mr. Nash and Helene Nikas,

were present at the August 22, 2001 meeting with Thomas.  Id. at 269-70.  The defendants assert

that during this meeting "Mr. Thomas said that he told Cordero since he was not being paid for

starting his shift early[,] he was not going to relieve the officer and walked away.  Thomas also

indicated that he raised his voice, and made gestures to Mr. Cordero.  When asked if the gesture

could be interpreted as threatening, Thomas said that although he did not feel that the gesture

was imposing, he could see how others would interpret it as being intimidating."  Tighe Aff.

¶ 11.  Thomas has not contradicted this recounting of Thomas's statements at the August 22

meeting.

        On S.E.A.L.'s instruction, Thomas reported to work on the evening of August 22, 2001.

Id. at 271; see Reinstatement Letter, dated Aug. 22, 2001 (reproduced as Ex. PE-18 to Thomas

Aff.; Ex. B-6 to Serrins Aff.).  But the next day, he "was called at home . . . and [he] was told

that he [had been] terminated based on statements made by [him] at that meeting."  Thomas Dep. at 271.  Thomas received confirmation of his termination by letter.  Id.; see also Letter from Robert Tighe to Brian Thomas, dated Aug. 27, 2001 (reproduced as Ex. B-7 to Serrins Aff.)

Thomas submitted a letter to the New York City Commission of Human Rights on September 10, 2001, see Thomas Dep. at 21; Thomas Aff., at 4-5 (citing Letter to Brian Thomas from A.L. Meyers, dated Sept. 10, 2001 (reproduced as Ex. PE-8 to Thomas Aff.)), and one to the New York State Division of Human Rights, see Thomas Dep. at 103-06.  Also subsequent to his termination, see id. at 58, Thomas filed a wage and salary complaint with the United States Department of Labor.  See id. at 106-08; see also Letter to Brian Thomas from Corlis Sellers, dated Jan. 30, 2006 (reproduced as Ex. PE-17 to Thomas Aff.).  Eventually, his overtime complaint with the Department of Labor resulted in the receipt of three checks totaling approximately $1,800 and additional monetary awards to other S.E.A.L. employees.  See Thomas Dep. at 107-08.

B.  Procedural History

Thomas, through counsel, filed a complaint in this action on December 27, 2004 (Docket #1) ("Compl.") alleging racial and national origin discrimination and retaliation under 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981, the Fair Labor Standards Act, and state law.  See Compl. ¶ 1.  Thomas, again through (new) counsel, amended his complaint in 2006.  See First Amended Complaint, filed Jan. 10, 2006 (Docket #14) ("Am. Compl.").  Counsel's motion to withdraw was granted and Thomas now proceeds pro se.  See Order, dated Sept. 27, 2006 (Docket # 21).

Defendants filed the instant motion on December 28, 2006.[1]  Thomas opposed the motion through a sworn affidavit, see Thomas Aff., and defendants have filed reply papers.  See Reply Affidavit of Alan Serrins in Support of Summary Judgment, filed Feb. 12, 2007 (Docket #30) (Serrins Reply Aff.).

II. LAW GOVERNING SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)), cert. denied, 484 U.S. 1066 (1988).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)); Brosseau v. Haugen, 543 U.S. 194, 195 n.2 (2004).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with

_____

[1] See Not. of Mot.; Defendants' Statement Pursuant to Local Rule 56.2, dated Dec. 26, 2006 (attached to Not. of Mot.) ("Def. 56.2"); Defendants' Statement Pursuant to Local Rule 56.1 (attached to Not. of Mot.) ("Def. 56.1"); Serrins Aff.; Def. Mem.; see also Defendants' Amended Statement Pursuant to Local Rule 56.1, dated Jan. 4, 2007 (Docket #31) ("Def. Am. 56.1").

'specific facts showing that there is a <u>genuine issue for trial</u>,'" <u>Matsushita Elec. Indus. Co., Ltd.</u>
<u>v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in
original), and "may not rely on conclusory allegations or unsubstantiated speculation." <u>Scotto v.</u>
<u>Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must
offer "concrete evidence from which a reasonable juror could return a verdict in his favor."
<u>Anderson</u>, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial,
summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish
the existence of an element essential to [its] case." <u>Nebraska v. Wyoming</u>, 507 U.S. 584, 590
(1993) (quoting <u>Celotex</u>, 477 U.S. at 322) (internal quotation marks omitted) (alteration in
original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails
to come forward with enough evidence to create a genuine factual issue to be tried with respect
to an element essential to its case." <u>Allen v. Cuomo</u>, 100 F.3d 253, 258 (2d Cir. 1996) (citing
<u>Anderson</u>, 477 U.S. at 247-48).

Although the Second Circuit has noted that "an extra measure of caution" is needed in
granting summary judgment in discrimination cases since direct evidence of discriminatory
intent is rare, a finding of summary judgment is nonetheless appropriate for discrimination
claims lacking a genuine issue of material fact. <u>Schiano v. Quality Payroll Sys., Inc.</u>,
445 F.3d 597, 603 (2d Cir. 2006) (citing cases); <u>Holtz v Rockefeller & Co.</u>, 258 F.3d 62, 69 (2d
Cir. 2001) (citations omitted); <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir.)
("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive
context of discrimination cases."), <u>cert.</u> <u>denied</u>, 534 U.S. 993 (2001).

III.  DISCUSSION

    A.  The Merits of Thomas's Title VII and § 1981 Discrimination Claims

            1.  Legal Standards

Thomas's claims of racial discrimination under Title VII and section 1981 are analyzed under the framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (quoting James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000)); Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP, 2007 WL 1683552, at *6 (S.D.N.Y. June 3, 2007); see also Patterson v. McLean Credit Union, 491 U.S. 164 (1989) (method of analysis and scheme of proof . . . for disparate treatment claims is identical under § 1981 and Title VII).[2]

Under McDonnell Douglas, the plaintiff carries the initial burden of establishing a prima facie case of discrimination.  See 411 U.S. at 802; accord St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); Leavitt, 465 F.3d at 90 (quoting James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000)); Evans-Gadsden, 2007 WL 1683552, at *6.  This burden has been characterized as "minimal."  McPherson v. New York City Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006) (citations omitted); Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005).  The elements of a prima facie case are discussed further in the next section.

If the plaintiff establishes a prima facie case, a presumption of discrimination is created

---

[2]Thomas's claim of national origin discrimination cannot proceed under 42 U.S.C. § 1981, however, because section 1981 does not prohibit discrimination based on national origin. See Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987); Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998), cert. granted, 526 U.S. 1086, cert. dismissed, 527 U.S. 1030 (1999); Ghose v. Century 21, Inc., 108 F. Supp. 2d 373, 380 (S.D.N.Y. 2000), aff'd 12 Fed. Appx. 52 (2d Cir. 2001).

and the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. McDonnell Douglas, 411 U.S. at 802; St. Mary's, 509 U.S. at 506-07; Burdine, 450 U.S. at 253-5; Leavitt, 465 F.3d at 90; Evans-Gadsden, 2007 WL 1683552, at *6. If the employer articulates such a reason for its action, the presumption of discrimination is eliminated and "the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000); see also Burdine, 450 U.S. at 256 (if the employer articulates a nondiscriminatory reason for the action, plaintiff "must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision"). This is because "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" St. Mary's, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253) (alteration in original). Thus, the plaintiff "must always prove that the conduct at issue . . . actually constituted discrimination." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (internal quotation marks, emphasis and bracketing omitted).

### 2. Disparate Treatment of Thomas Based on Race and National Origin

To establish a prima facie case of disparate treatment, Thomas must demonstrate that: (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. See Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (citing McDonnell Douglas, 411 U.S. at 802). The fourth element is a "flexible one that can be satisfied differently in differing factual scenarios." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91

(2d Cir. 1996).  Some possible scenarios are:

> the employer's criticism of the plaintiff's performance in ethnically degrading
> terms; or its invidious comments about others in the employee's protected group;
> or the more favorable treatment of employees not in the protected group; or the
> sequence of events leading to the plaintiff's discharge.

Abdu-Brisson, 239 F.3d at 468 (citation omitted).  Generally, "[s]ince it is rare indeed to find in

an employer's records proof that a personnel decision was made for a discriminatory reason,

whatever other relevant depositions, affidavits and materials are before the district court must be

carefully scrutinized for circumstantial evidence that could support an inference of

discrimination."  Chertkova, 92 F.3d at 87 (citing Chambers v. TRM Copy Ctrs. Corp., 43 F.3d

29, 37 (2d Cir. 1994)).

There is no doubt that Thomas meets the first three elements of the test.  Thomas is an

African-American of Guyanese decent, see Am. Compl. ¶ 6; he was discharged from his job, see

Thomas Dep. at 271-73; see also Tighe Aff. ¶ 20; and his termination constitutes an adverse

action.  See, e.g., Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005).  However, having

considered the evidence offered by Thomas, consisting of his affidavit, and having reviewed his

deposition (which was offered only by defendants), there is insufficient admissible evidence to

establish the final element of the prima facie case: circumstances giving rise to an inference of

discrimination.

In his affidavit, Thomas discusses at length why he believes he complied with S.E.A.L.'s

procedures, Thomas Aff. at 4; why certain of S.E.A.L. Security's actions were "totally

inappropriate," id. at 5; why he "did not need permission to call out" (referring to his

announcement that he "would not be in" to work on August 13, see id. at 222-23), id. at 6; and

other assertions relating to perceived problems in his termination.  There is no evidence in the

11

affidavit that supports an inference of discrimination, however.

The one possible exception is his discussion of another employee, Julie O'Brien, who is identified as "Caucasian." Thomas Aff. at 9. Thomas states that O'Brien was not called at home when she called in sick shortly after beginning employment. Id.; see also Thomas Dep. at 121-24, 135. This contention, however does not help Thomas's case. Where a plaintiff attempts to show that "the employer treated plaintiff less favorably than a similarly situated employee outside [his] protected group . . . [he] must show []he was similarly situated in all material respects to the individuals with whom []he seeks to compare [him]self." Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation and citation omitted); accord Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997); see also McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001) ("A plaintiff is not obligated to show disparate treatment of an identically situated employee" when presenting prima facie evidence of discrimination, but the object of comparison "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.") (emphasis omitted). By Thomas's own admission, O'Brien was not in the same situation as Thomas, given that Thomas did not call in sick. Rather, Thomas states that he announced he was not working on August 13 or August 14 because he had "problems, some stuff to take care of at home . . . ." Thomas Dep. at 222. In any event, in their reply affidavit, defendants explain that "Ms. O'Brien was not employed as a security officer, but was hired in a supervisory capacity, and not similarly situated to Plaintiff. She was therefore not required to observe the same procedures to account for her time as Plaintiff." Serrins Reply Aff. ¶ e.

The Court has not relied on Thomas's affidavit alone in attempting to determine if he has raised an inference of discrimination.  It has also reviewed his deposition, at which Thomas was asked by defense counsel for the bases of his belief that he was the victim of racial discrimination.[3]  Although Thomas described a number of circumstances that led him to his belief that S.E.A.L. intentionally discriminated on the basis of race, very few of these circumstances warrant discussion inasmuch as Thomas provides no evidence that lends support to his belief.  For instance, Thomas infers racial discrimination from the fact that certain relevant players were not present at his disciplinary interview.  Thomas Dep. at 116-17.  But Thomas "provides no explanation of how the fact that [Thomas's] direct supervisor was not present at [a] company-initiated, disciplinary fact-finding hearing[] proves racial discrimination, and the Court can find none."  Ford v. Consol. Edison Co. Inc., 2006 WL 538116, at *13 (S.D.N.Y. Mar. 3, 2006), aff'd, 225 Fed. Appx. 19 (2d Cir. 2007).  The only evidence Thomas presents to connect S.E.A.L.'s failure to have certain individuals attend this interview to Thomas's race is the fact that his former supervisor Hans Lambert told him that these individuals were present when a former Caucasian employee, George Gincher, was disciplined.  See Thomas Dep. at 117-20.

Putting aside the fact that this statement is hearsay and potentially inadmissible, Thomas stated that Gincher "had meetings in reference to things that bothered him[;] that he went down [to S.E.A.L.'s office] and he was allowed to express himself."  Id. at 117-18.  Thus, the two

---

[3]Thomas objects to the use of his deposition transcript on the ground that it was not submitted to him for signature.  See Thomas Aff. at 9.  The requirement to submit a deposition for signature, however, would have arisen only if Thomas had "requested" it.  Fed. R. Civ. P. 30(e).  Thomas does not state he made such a request.  In any event, if Thomas's request was granted, it would have no affect on the outcome of this case, as defendants have no need to rely on the deposition to prevail on their motion.  Indeed, the deposition has been cited by the Court solely to determine if it fills in the gaps in plaintiff's affidavit.

situations are not comparable.  In fact, Gincher's situation is consistent with S.E.A.L.'s "open door" policy.  See Tighe Aff. ¶ 18 (citing S.E.A.L. Employee Handbook).  Moreover, Cacciatore has stated that he did not generally attend disciplinary-related meetings and that he did not do so because "it was believed that my presence might prevent employees from freely presenting their side of the story."  Cacciatore Aff. ¶ 9.  This evidence is uncontradicted.

Thomas stated broadly at his deposition that S.E.A.L. had "different rules and procedures for Caucasians than [it has] for African-Americans," Thomas Dep. at 130, inasmuch as it was his "experience [was] that African-Americans would bear the brunt of [the S.E.A.L. policy] when it comes time to termination or discipline and Caucasians would be excluded from it totally."  Id. at 142.  As for specifics, Thomas noted that four other African-American employees were suspended on the same night as he was, id. at 137-38, and asserted that several white individuals caught violating company policy were not disciplined on other occasions.  However, as to the four other African-Americans, Thomas admits that he didn't "know what transpired, so [he could not] vouch for anything that happened with them."  Id. at 137.  As to white employees receiving allegedly preferential treatment, see id. at 126-27 (an employee "caught in pornography [internet] site"); id. at 128 (another employee was "always asleep in the lobby"); id. at 160-61 (one employee "comes into work, goes into the security office, sleeps"), Thomas gives no indication of how these employees were similarly situated to any non-white employees who received different treatment.

A jury would be unable to find the treatment of these employees as evidence of discrimination because there is no evidence that the individuals involved in these incidents were similarly situated in material respects.  Moreover, Thomas apparently has no personal knowledge

of what transpired with respect to these employees.  Nor has he provided affidavits from individuals with such knowledge or company records reflecting how the relevant employees were treated.  Thus, the evidence in the record regarding Thomas's allegations is insufficient to allow a finding of discrimination.  See, e.g., Wilson v. New York City Hous. Auth., 2007 WL 1032262, at *8 (S.D.N.Y. Apr. 2, 2007) ("conclusory and hearsay statements" insufficient to show inference of discrimination) (quoting Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)).

Thomas alluded at his deposition to another employee who was not fired for sleeping on the job until a year after Thomas reported him, see Thomas Dep. 128-29, whereas an African-American employee was terminated "on the spot."  See id. at 130.  But the mere fact that Thomas reported an employee sleeping on the job does not mean that management credited that report.  In addition, there is no information as to whether the two employees had similar work or disciplinary histories that would have warranted similar treatment.  Thomas reports that another white individual was sleeping on the job and eating when he should have been taking Thomas's reports, see id. at 160-61, but he states that he did not report this incident to S.E.A.L.  Id. at 161.  Under these circumstances, it would be impossible for a reasonable juror to find that S.E.A.L. treated this employee differently on the basis of race.[4]

---

[4]Thomas makes other allegations that certain actions were discriminatory.  See, e.g., Thomas Dep. at 142-45 (removal of employee from security office); id. at 174 (termination of Herb Smith, an African-American employee); id. at 148-49 ("Generally if a Caucasian security officer calls the office to speak on anything, the reception and the feedback that they would get would be different than if I called."); id. at 249-50 (Thomas was asked to relieve guards before his shift began because of Thomas's race).  With respect to each, however, there is simply no admissible evidence from which discrimination could be inferred.  In all instances, there is insufficient evidence that the employees were similarly situated.  In many of them, Thomas's information is not based on personal knowledge and no record has been provided that could substantiate any of the information.  See, e.g., id. at 44 (Thomas kept "mental records" and a

Thomas also makes more generalized complaints, including his complaints that "mainly Caucasians" were hired to work in the console room, id. at 52, and that, with one exception, only African-Americans were assigned to the basement. Id. at 180. Again, no information has been provided to allow for a comparison between white and non-white guards, such as the seniority of the individuals involved or any other relevant factors that would allow for a comparison. Even basic information such as whether the console room assignment was based on a request or some other basis is completely unknown. Likewise, Thomas admits that he "could only speak for [the demographic makeup of his] shift," in the basement, id. at 180, and has provided no statistics to bolster this claim.[5] In these circumstances, no reasonable juror could use Thomas's testimony on these points to find that S.E.A.L. intentionally discriminated against Thomas.

During his deposition Thomas also asserted that African-American guards were paid less, see Thomas Dep. at 95-98, 184-85, got lower bonuses, id. at 165-66, and did not get promoted on par with Caucasian employees. See id. at 169-73. As to the alleged wage differential, Thomas testified that African-American employees were paid $12 per hour, whereas white employees were paid an hourly rate of $28-30. Id. at 95. At one point, however, Thomas refers to a white employee who, like him, was paid $12 per hour. See id. 184-85. In any event, Thomas gives no basis for his personal knowledge regarding the pay levels of different employees. No documentation has been presented with respect to this assertion. In addition, there is no

---

"diary [that he] may have disposed of"); id. at 174 ("I don't know the circumstances surrounding [Herb Smith] leaving"); id. at 249 (Thomas "do[es]n't know" if white guards were also asked to relieve workers before their shifts began).

[5] In contrast, S.E.A.L. has appended a document listing the employees who worked the 7 a.m. to 3 p.m. shift which indicates that nearly a quarter of the guards on that shift were African-American. See Ex. D to Serrins Aff.

information regarding the backgrounds or experience of any of the employees to whom Thomas is referring.

Thomas's assertions during his deposition that bonuses and promotions differed according to race is similarly devoid of any evidentiary support.  In terms of the bonuses, Thomas testified that he got a $50 bonus for the year 2000 while one white employee "boast[ed] that he got a $1,500 bonus" for that year, see id. at 165, and another $750.  Id. at 166.  Again, this evidence is hearsay and could not be used by a jury to determine that there was a differential in pay based on race.  Thomas has not provided the Court with any evidence of payments.  Nor is there evidence as to whether there was any non-discriminatory reason to account for the differences.

Thomas asserts that S.E.A.L. has a discriminatory promotion system based on the statement of a colleague who told him that she had been passed over for a promotion, see id. at 172-73, but provides no information that would permit a comparison between the colleague and any other employee.  Further, Thomas admitted that he "[did]n't know [the promoted employee's] background or experience," id. at 172, though he states that the unpromoted colleague "had more experience in the console than [the promoted employee]."  Id. at 173.  As to the alleged promotion of O'Brien, Thomas states that he did not "know what she was prior, what her relationship with the company is," id. at 170, but, based on his own observations, recalled that "[i]n one week time she came in as a security guard, and in that same week, at the end of that week she was promoted to a scheduler."  Id. at 171.  Defendants have, in a sworn statement, provided specific evidence on this point: namely, that O'Brien was hired in a "supervisory capacity."  Serrins Reply Aff. ¶ e.

17

Equally lacking in basic evidentiary support is Thomas's general claim that race accounted for certain differences between the company policy vis-á-vis the 7 a.m. to 3 p.m. and the 11 p.m. to 7 a.m. shift.  See id. at 190-95.  For instance, Thomas testified that the earlier shift, which was "95%" Caucasian, see id. at 194, had a more favorable call-out policy, see id. at 192-94 (two hours as opposed to four), than the later shift, which was "predominantly" comprised of African- Americans.  Id. at 190-91.  Also, Thomas states that the earlier shift was provided with suits as opposed to uniforms.  Id.  Putting aside the fact that Tighe states in his affidavit that thirteen of the security officers on the 7 a.m. to 3 p.m. shift were African-American or Hispanic, see Tighe Aff. ¶ 16, there is nothing in the record that would allow a comparison between these two shifts or any finding as to whether the personnel were similarly situated.

Lastly, Thomas recalls a statement Tighe made to him when he entered his disciplinary interview.  Thomas recalls that Tighe "made a remark when [he] got in there . . . that [he] shouldn't start throwing chairs around."  Thomas Dep. at 114.  Thomas "inferred from that that Mr. Tighe believed that an African-American cannot walk in a place and conduct him or herself in a proper manner without getting into an altercation."  Id.; see also id. at 270.  But merely "[c]hoosing one explanation over another without more evidence is a matter of speculation" and cannot support a motion to defeat summary judgment.  See Cameron v. Cmty. Aid For Retarded Children, Inc., 335 F.3d 60, 65 (2d Cir. 2003).

In sum, Thomas during his deposition makes only a series of conclusory, vague and/or unsupported allegations that do not support an inference of discrimination.

### 3. Pattern and Practice of Racial Discrimination

In his amended complaint, Thomas alleges that defendants' acts constitute "a pattern or

practice favoring Caucasian security guards to the detriment of African-American security officers based on race[,] color, or national origin . . . ."  See Am. Compl. ¶ 46.

First, it is not even clear that a plaintiff may bring a pattern-or-practice claim outside of a class action suit.  See Blake v. Bronx Lebanon Hosp. Ctr., 2003 WL 21910867, at *5 (S.D.N.Y. Aug. 11, 2003) ("[T]he court doubts that a plaintiff can bring a 'pattern and practice' claim in a non-class action complaint.") (citing cases suggesting that pattern-or-practice claims are not appropriate in non-class actions).  Second, the ruling in Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), suggests that "courts should not readily allow plaintiffs to allege pattern or practice claims based on a series of discriminatory acts."  Timothy v. Our Lady of Mercy Med. Ctr., 2004 WL 503760, at *4 (S.D.N.Y. Mar. 12, 2004).

"To succeed on a pattern-or-practice claim, plaintiffs must prove more than sporadic acts of discrimination; rather, they must establish that intentional discrimination was the defendant's 'standard operating procedure.'"  Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 158 (2d Cir. 2001) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977)), cert. denied, 535 U.S. 951 (2002); accord Milani v. Int'l Bus. Machs. Corp., Inc., 322 F. Supp. 2d 434, 452-53 (S.D.N.Y. 2004).  Accordingly, generalized allegations that discrete discriminatory acts constitute a pattern or practice of unlawful discrimination are insufficient. See Blake, 2003 WL 21910867, at *5 ("[A] plaintiff does not properly allege an ongoing discriminatory policy simply by invoking the magic words 'pattern' or 'practice.'"); accord Gross v. Nat'l Broad. Co., 232 F. Supp. 2d 58, 68 (S.D.N.Y. 2002); Timothy, 2004 WL 503760, at *3.  Rather, a plaintiff must identify a policy or practice that underlies the discrete acts of discrimination.  See Milani, 322 F. Supp. 2d at 452-53 (discrete acts of failure to promote,

failure to be compensated adequately, and denials of preferred job assignments could not be found to constitute a pattern or practice of discrimination absent any evidence of an underlying discriminatory policy or practice).  In Timothy, 2004 WL 503760, the court found that the plaintiff's allegation that her demotion and unfavorable work assignments were "based upon systematic discrimination against minority employees and child-rearing women" was insufficient to state a pattern-or-practice claim, and thus certain discrete discriminatory acts were time-barred.  Id. at *3-4.  Similarly, in Blake, 2003 WL 21910867, the court was "not convinced that plaintiff has truly pleaded a 'pattern and practice' claim which might still form the basis of a continuing violation after Morgan," even where the plaintiff argued that he was receiving disparate pay as a result of a discriminatory status assignment regime.  Id. at *5.

In the present case, Thomas's affidavit does not contain support for this "policy and practice" claim.  Nowhere has Thomas given admissible evidence of "discrete acts of discrimination," let alone "a policy or practice that underlies" those acts.

\*       \*       \*

In sum, Thomas has presented no evidence upon which a "rational trier of fact" could conclude that he was subjected to race or national origin discrimination.  McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997).  Instead, he has "done little more than cite to [his] mistreatment and ask the court to conclude that it must have been related to [his race/national origin].  This is not sufficient."  Lizardo v. Denny's, Inc., 270 F.3d 94, 104 (2d Cir. 2001).

B. <u>Retaliation Claims</u>

    1. <u>Title VII</u>

Title VII makes it unlawful for an employer to take adverse action against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "Title VII 'is violated when a retaliatory motive plays a part in adverse employment actions . . . whether or not it was the sole cause.'" <u>Terry v. Ashcroft</u>, 336 F.3d 128, 140-41 (2d Cir. 2003) (quoting <u>Cosgrove v. Sears, Roebuck & Co.</u>, 9 F.3d 1033, 1039 (2d Cir. 1993)); <u>cf.</u> <u>Hawkins v. 1115 Legal Serv. Care</u>, 163 F.3d 684, 693 (2d Cir. 1998) (retaliation claims are cognizable where the retaliation was taken "in response to the claimant's assertion of rights that were protected by § 1981") (citations omitted). A violation occurs whenever there is "retaliatory animus, even if valid objective reasons for the discharge exist." <u>Gordon v. New York Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir. 2000) (quoting <u>Cosgrove</u>, 9 F.3d at 1039); <u>accord</u> <u>Moore v. Consol. Edison Co. Inc.</u>, 2007 WL 831807, at *7 (S.D.N.Y. Mar. 20, 2007).

Retaliation claims are also analyzed under the <u>McDonnell Douglas</u> test already discussed. <u>See</u>, <u>e.g.</u>, <u>Terry</u>, 336 F.3d at 141; <u>Moore</u>, 2007 WL 831807, at *5-6. In order to establish a prima facie case of retaliation, a plaintiff must show by a preponderance of the evidence "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005) (quoting <u>McMenemy v. City of Rochester</u>, 241 F.3d 279, 282-83 (2d Cir. 2001)).

Generally, a plaintiff may demonstrate the fourth element either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon, 232 F.3d at 117 (citing Cosgrove, 9 F.3d at 1039).

In his amended complaint, Thomas articulates his Title VII retaliation claim as follows: "plaintiff was terminated on August 24, 2001, after complaining of overtime violations and discrimination via a written communication dated August 13, 2001." Am. Compl. ¶ 22.  This reference is to a letter Thomas wrote to William Kenney, S.E.A.L.'s Director of Operations. See Thomas Dep. at 235-38; Tighe Aff. ¶ 18; Def. Mem. at 4,12.  Thomas testified that although the document was dated August 12, 2001 on one page and August 13, 2001 on another page, he sent it on August 9, 2001 and the letter was "received by Mr. Kenney on August 9," Thomas Dep. at 236-37, a fact he knew because "[he and Mr. Kenny] discussed it." Id. at 237.

Thomas's affidavit gives no indication that his firing was the result of retaliation for complaints of discrimination, but in his deposition, it is clear that this letter contained both concerns about discrimination and retaliation.  See Thomas Dep. at 235-62 ("equal pay provisions are not being enforced," see id. at 260; "hostile work environment is present," see id.; "discrimination in job assignments," see id. at 259; "bias related harassment based on retaliation."  See id. at 252.).

Under Title VII, an informal complaint such as this constitutes protected activity.  See, e.g., Wright v. Stern, 450 F. Supp. 2d 335, 374, 377 (S.D.N.Y. 2006) (informal complaint to supervisor is protected activity under Title VII); Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 364 (S.D.N.Y. 2006) (same); Ford, 2006 WL 538116, at *18 ("If Plaintiff had complained to his

supervisors about race discrimination in the workplace, these complaints would be protected"
under section 1981).

With respect to the remaining elements of a <u>prima facie</u> case, it is undisputed that Tighe
was aware of the letter to Kenney when he made the decision to terminate Thomas.  <u>See</u> Tighe
Aff. ¶ 18.  Nor is there any dispute that termination is an adverse employment action.  Finally,
that Thomas was fired approximately two weeks after he wrote the letter to Kenney suffices as
indirect evidence from which a rational juror could infer a causal connection between his
protected activity and his termination.  <u>See</u>, <u>e.g.</u>, <u>Feingold v. New York</u>, 366 F.3d 138, 156-57
(2d Cir. 2004) (issue of fact as to causation where two weeks elapsed between complaint and
firing); <u>Reed v. A.W. Lawrence & Co., Inc.</u>, 95 F.3d 1170, 1178 (2d Cir. 1996) (causal
connection established where twelve days elapsed between complaint and discharge).  Thus,
Thomas has made a prima facie case of retaliation.

Once a plaintiff makes out a prima face case, the defendant is obligated to articulate a
legitimate, nondiscriminatory basis for the alleged retaliatory acts.  <u>See</u>, <u>e.g.</u>, <u>Feingold</u>, 366 F.3d
at 157; <u>accord</u> <u>Burdine</u>, 450 U.S. at 254-55; <u>Dister v. Cont'l Group, Inc.</u>, 859 F.2d 1108, 1115
(2d Cir. 1988); <u>Nix v. Cino</u>, 2006 WL 2711625, at *6 (E.D.N.Y. Sept. 21, 2006).  Here, the
defendants have put forth legitimate nondiscriminatory reasons for Thomas's termination:
namely (1) insubordination based on the August 7, 2001 incident with Cordero, and (2)
insubordination based on his absence on August 13 and 14, 2001.  <u>See</u> Def. Mem. at 6-7; Tighe
Aff. ¶ 15; <u>see also</u> Termination Letter (reproduced as Ex. B-7 to Serrins Aff.; Ex. PE-3 to
Thomas Aff.).  Defendants have referred to these reasons as Thomas's "unprofessional conduct."
<u>See</u> Def. Mem. at 11.

When the employer gives legitimate, nondiscriminatory reasons for plaintiff's firing, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.  See, e.g., Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).  Thus, the question becomes whether there is "evidence that would be sufficient to permit a rational factfinder to conclude that [S.E.A.L.'s] explanation is merely a pretext for impermissible retaliation."  Id.; see also Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002).  Ultimately, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove . . . ."  James, 233 F.3d at 157.  Here, Thomas must prove that retaliation for his August 9, 2001 complaint of discrimination "was a substantial motivating reason for" his termination.  Fields v. New York State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 121 (2d Cir. 1997) (emphasis in original); see also id. (plaintiff "need not prove that [retaliation] was the sole motivating factor" or that "the employer's proffered explanation was pretextual").

The evidence presented in Thomas's affidavit does nothing to meet his burden.  Thomas's affidavit consists essentially of an attack on the nature of the defendants' evidence in support of their decision to terminate him.  For example, he "objects to the use of" documentation suggesting that he was insubordinate on August 7, 2001 because Cordero himself "has not submitted an affidavit in support of" such documents.  Thomas Aff. at 8.  He likewise objects to the use of "all the defendants affidavit[s] with regards to any of plaintiffs claims of discrimination as the defendants were not present at anytime for none of the so called reasons for termination."  Id.  These arguments, however, ignore the fact that it is the motivation of the

decisionmaker who terminated Thomas – in this case Tighe, see Tighe Aff. ¶ 18 – that is at issue, and that it is Thomas who bears the burden of showing that Tighe was motivated in part by retaliation.

Thomas's deposition offers essentially two pieces of evidence which might be taken as support for his contention that retaliation was the real reason that he was terminated: (1) he was not discourteous on August 7, 2001, see Thomas Dep. at 215-17; and (2) his absences on August 13 and August 14, 2001 should not have been considered "unauthorized" or "insubordinate" because they were in compliance with the S.E.A.L. Employee Handbook, which requires that an employee report an absence with at least four hours advance notice. See Thomas Dep. at 223-31; see also S.E.A.L. Employee Handbook (reproduced at Ex. PE-6 to Thomas Aff.), at 19.

With respect to the first piece of evidence, the contemporaneous reprimand of Thomas states that Thomas became "agitated and combative" at the August 7 encounter when asked to relieve another officer prior to the start of his shift. See Off. Rep. While we accept Thomas's assertion that he did not engage in discourteous behavior, see Thomas Dep. at 215-17, Thomas has not rebutted Tighe's statement in his affidavit that Thomas stated during his meeting with Tighe on August 22 that he had "raised his voice" on August 7; that he had told Cordero since he was not being paid for his shift, "he was not going to relieve the officer"; that Thomas "walked away"; that he had "made gestures to Mr. Cordero"; and that these were gestures that "others would interpret . . . as being intimidating." See Tighe Aff. ¶ 11. Thomas also has not rebutted Tighe's statement that Thomas admitted that if a supervisor other than Cordero had made the request of him, he would have complied. See id. ¶ 10.

The next day, August 8, 2001, Thomas was served with an Official Reprimand which he

25

refused to sign "[b]ecause [he] was not in agreement with . . . the whole document, because [it] never occurred." Thomas Dep. at 215.  He was told, "if you don't sign it, you are to be suspended for two days . . . ."  Id. at 220-21.  He did not sign it and was then suspended.  Id. at 220.  It is uncontroverted that the decision to suspend could not have been based on any retaliation since Thomas had not yet written his August 9 letter to Kenney.  See id. at 140-41; 235-38.

Thomas's suspension covered two days: August 9 and August 12.  See id. at 222-23; see also Cacciatore Aff. ¶ 4.  Although he was to return to work on August 13, see Tighe Aff. ¶ 5, he called S.E.A.L. on August 13 to report that he would be not be coming to work[6] because he had "some stuff to take care of at home."  See Thomas Dep. at 222-23.  A few hours later, supervisor Cordero called Thomas at home to inform him that if he did not report to work, his absence would be considered "post abandonment".  See id. at 224; Cacciatore Aff. ¶ 5.[7]  There is no evidence that Cordero knew of Thomas's August 9 letter to Kenney at the time of this call.  When Thomas did not report to work, Thomas Dep. at 222, he was suspended again, see id. at 234, 258, and then terminated on August 23, 2001.  See id. at 271-72.

Thomas argues that his absence should have been considered proper under the S.E.A.L.

---

[6]While all parties agree that Thomas called in on August 13, it is less clear which dates Thomas indicated that he would be out.  See Tighe Aff. ¶¶ 5-6 (Thomas "instructed to work" August 13, 2001, but did not report on that date, and also "failed to report to work on" August 14 and 15, 2001); Cacciatore Aff. ¶¶ 5-6 (Thomas called on the 13th and "told that if he did not report to work the next day, he would be considered absent without authorization."); see also Ex. C-12 to Serrins Aff. (Thomas "informed [S.E.A.L.] that he would not be in tonight[,] 8/14 & tomorrow night . . . .").

[7]Thomas concedes that during this telephone call he "may have spoken to [his supervisor] in a harsh manner," although he did not "vent[] any anger," id. at 229.  When he was told that he would be considered absent without leave, he "h[u]ng up the phone," id. at 230, because he thought "the conversation was over."  Id. at 231.

Employee Handbook, which states: "If you are unable to report to work due to illness, injury or any other reason, you must notify your supervisor and provide the reason for your absence as far in advance as possible, but at least four hours before the start of your shift." See S.E.A.L. Employee Handbook, at 19.  In Thomas's view, this provision meant that S.E.A.L. could not require a worker to appear at his shift as long as the worker gave at least four hours notice of his intention to not to do so.  But Thomas does not deny that he was instructed by his supervisor to report to work and that he openly disobeyed that order.

The reasons given by S.E.A.L. accord with the contemporaneous documentation of Thomas's firing, in which S.E.A.L. states that he was fired because he did not report to work "as scheduled to and verbally directed to," or in other words, for "insubordination."  See Termination Letter.  Thomas has submitted no evidence that persons in a similar situation were treated any differently.  Notably, Tighe has submitted uncontroverted evidence that employees who did not engage in protected activity were dismissed for similar reasons.  Tighe Aff. ¶ 19; accord Cacciatore Aff. ¶ 12.

Essentially, Thomas's only evidence of retaliation is the temporal proximity of the letter to Kenney and his termination.  While this proximity

> gives rise to an inference of retaliation for the purposes of plaintiff's prima facie case, without more, such temporal proximity is insufficient to satisfy [his] burden to bring forward some evidence of pretext.  See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 770 (2d Cir. 1998) (holding that a strong temporal connection between the plaintiff's complaint and other circumstantial evidence is sufficient to raise an issue with respect to pretext).

Montgomery v. Chertoff, 2007 WL 1233551, at *21 (E.D.N.Y. Apr. 25, 2007).

In sum, given the uncontroverted evidence that Tighe believed that Thomas had engaged in improper conduct, and the absence of any evidence that persons in Thomas's situation were

27

not terminated, a reasonable jury could not use the evidence in the current record to find that the complaint to Kenney "was a substantial motivating factor" for his termination. Fields, 115 F.3d at 121 (emphasis omitted).

### 2. Retaliation under the FLSA

The Fair Labor Standards Act makes it "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . related to this chapter. . . ." 29 U.S.C. § 215(a)(3).  Here, Thomas states in his affidavit that the "real reason for defendant's [sic] actions, [] was the overtime conversation plaintiff, had with Rene Cordero."  Thomas Aff. at 7; Am. Compl. ¶ 48.

The FLSA, however, "limits the cause of action to retaliation for filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor."  Lambert v. Genesee Hosp., 10 F.3d 46, 55 (2d Cir. 1993), cert. denied, 511 U.S. 1052 (1994); accord Shah v. Wilco Sys., Inc., 126 F. Supp. 2d 641, 651-52 (S.D.N.Y. 2000) ("employment decisions taken in response to complaints to a supervisor, or discussions with co-workers, are not actionable under the FLSA") (citing cases).  Because there is no evidence that Thomas filed a formal complaint for violations of the FLSA before his termination, this claim must fail as a matter of law.[8]

### C. State Law Claims

Thomas asserts his discrimination and retaliation claims also under the New York State Human Rights Law and the New York City Human Rights Law.  See Am. Compl. ¶¶ 40, 42, 44,

_____

[8]Thomas's complaint states the defendants violated the FLSA also by failing to pay overtime.  Am. Comp. ¶ 48.  But Thomas has offered no evidence as to the alleged underpayments.  Accordingly, this aspect of his FLSA claim must also be dismissed.

46.  The standards for liability under the State and City Human Rights Laws are the same as those under equivalent federal anti-discrimination statutes.  Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714-15 (2d Cir. 1996); Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000).  Accordingly, these claims fail as well.

Conclusion

For the foregoing reasons, defendants' motion for summary judgment should be granted.

**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (e).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Jed. S. Rakoff, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Rakoff.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985).

Dated: August 30, 2007
       New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

29

Copies sent to:

Brian Thomas
33 Allan Terrace
Howell, NJ 07731

Alan Serrins
Queller, Fischer, Dienst, Serrins, Washor & Kool, LLP
223 Broadway
New York, NY 10279

Hon. Jed S. Rakoff
United States District Judge

46. The standards for liability under the State and City Human Rights Laws are the same as those under equivalent federal anti-discrimination statutes. <u>Ferraro v. Kellwood Co.</u>, 440 F.3d 96, 99 (2d Cir. 2006); <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 714-15 (2d Cir. 1996); <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 565 n.1 (2d Cir. 2000).  Accordingly, these claims fail as well.

<u>Conclusion</u>

For the foregoing reasons, defendants' motion for summary judgment should be granted.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections.  <u>See also</u> Fed. R. Civ. P. 6(a), (e).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Jed. S. Rakoff, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Rakoff.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

Dated: August 30, 2007
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge